UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICKEY G. EAGLE,

       Plaintiff,                                  Case No 06-11705

vs.

                                              DISTRICT JUDGE GEORGE CARAM STEEH

JO ANNE B. BARNHART,                   MAGISTRATE JUDGE STEVEN D. PEPE
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

**I.    BACKGROUND**

Rickey G. Eagle brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For reasons noted below IT IS RECOMMENDED that Plaintiff's motion for summary judgment be DENIED and Defendant's motion for summary judgment be GRANTED.

    **A.    Procedural History**

Plaintiff was born May 15, 1958, and was 44 when he filed his January 6, 2003, application for DIB alleging disability as of May 15, 2002 (R. 31-33), due to back pain, migraine headaches, and depression (R. 48). His application was denied initially (R. 21-26). A de novo hearing was held on May 12, 2005, before (ALJ) Ethel Revels (R. 211-67). ALJ Revels denied disability benefits in an August 25, 2005, decision (R. 13-20). The Appeals Council denied Plaintiff's request for review on February 6, 2006 (R. 3-5).

  **B.**  **Background Facts**

    **1.**  *Plaintiff's Application and Written Submissions*

  In his January 6, 2003, Disability Report, he describes his disability as migraines, depression, a back injury with L2-L3 fused in a 1984 back surgery (R. 48). His back pain caused him to work fewer hours and change jobs over thirty times. He has to take pain medication every day and these medications also limit his ability to work. He stopped his assembly job at Ford because the pain worsened and he was told that his employer did not have a job that could accommodate his back condition (R. 48 & 46).

  A February 23, 2003, Daily Activities form notes that he normally wakes up at ten in the morning and goes to sleep at seven or eight in the evening (R. 76). Pain awakens him three or four times a week. He often naps to alleviate back pain caused by overexertion. Although he does not need assistance dressing or grooming, he must "take [his] time," and personal care chores take him longer to complete than they did before his illness began.

  Plaintiff prepares all of his meals and meals for his wife and son. His wife helps him when he has back pain. He has lost forty pounds since his impairment began. Plaintiff does laundry, vacuums, and washes dishes daily with the assistance of his wife (R. 77). Because he takes frequent breaks these chores take him all day. With his wife's help, Plaintiff drives to neighborhood stores to do weekly grocery shopping.

  Plaintiff reads newspapers and magazines for one or two hours at a time, and his favorite subject is the outdoors (R. 78). He also watches television and listens to the radio for five hours a day. His hobbies are fishing and hunting which he does whenever he can but less than before his injury. Whenever he hunts, someone with a four-wheel vehicle has to take him into the

woods, because he cannot walk long distances.

Plaintiff visits his friends and family infrequently for two or three hours at a time (R. 78-79). They go out to eat or go fishing. His wife and son accompany him. Plaintiff also attends Veterans of Foreign Wars activities weekly for around one to two hours at a time. He does not need assistance going to these activities where he usually just sits. He noted the cost of having others do chores like cutting grass and shoveling snow.

Plaintiff began having pain in October 1999 when he injured his back after getting caught in an assembly line machine (R. 80). His pain, located in his low back, has worsened since then. He characterized the pain as aching and throbbing, extending to both legs and feet . He has pain everyday without activity and he stated that "anything" causes it and "anything" makes it worse. "[H]ot tub[s], pain medication (Vicodin), and time on the couch" provide relief. (*Id.*)

Plaintiff takes two to four Vicodin a day which helps him feel better as does lying down for about one hour (R. 81). He stated that his addiction to Vicodin is a side effect of the medication, and he cannot drive to work, fish, or hunt when he takes the medication. His sex life is also adversely affected.

Plaintiff's back pain since the accident also limits his ability to walk. On a "good day" he is able to walk one hundred feet and on a "bad day" he is able to walk ten feet (R. 81). He must stop walking and rest for a minute due to back pain. If the pain is too great, he returns home. He decided to use a cane to aid his walking (R. 82).

Plaintiff can stand for thirty to forty-five minutes at a time on a good day, but for only five minutes on a bad day. He can lift and carry five to ten pounds at a maximum, and he can sit for two to four hours on a good day. He can use his arms and hands if he does not bend, twist, or

lift over five to ten pounds. Plaintiff's doctor has limited his lifting to five to ten pounds with no pushing, pulling, bending, stooping, twisting.

In an undated form, Plaintiff indicated that, since May 29, 2003, when he requested a hearing, his condition changed – his back pain has increased and his headaches are more frequent (R. 83). He also can no longer go hunting, go four-wheeling, ride his Harley or lift weights. Further, he has lost thirty pounds (down from the 40 pound loss noted in his February 23, 2003, Daily Activities report, R. 76), and changes in his sex life have created marriage problems.

He also notes that he sees his treating physician, Dr. Matthew Sciotti, almost two times a week for his back pain, and that he is receiving treatment in the form of physical therapy and Vicodin. He also was treating with "Dr. M Raham (sic)" every three months for high blood pressure, acid reflux and depression (R. 84). Plaintiff received depression medication from Dr. Rahman. At the time he completed the form, Plaintiff was taking Vicodin, an anti-depressant, and high blood pressure medication.

### 2.    *Plaintiff's Hearing Testimony*

Again, Plaintiff was born on May 15, 1958, and was forty-six years old at the time of his hearing (R. 217). He had been married for twenty-four years, and was living with his wife and their sixteen-year old son, Shaun (R. 218 & R. 32). He completed high school and obtained an associate's degree in management (R. 218-19). After serving in the Army Airborne Rangers for eleven years, he was honorably discharged for medical reasons (R. 219). After his service in the Army ended in 1990, he was employed at Ford Motor Company for eleven years as a laborer, "slinging bumpers" weighing twenty to fifty pounds. His job involved standing for nine or ten

hours a day, and lifting, and pushing, bending, and pulling (R. 219-20).

As an Airborne Ranger, Plaintiff sustained a back injury due to bad jump for which he had surgery on his back in 1984 (R. 221). He continued experiencing lower back and leg pain at work. He suffered another injury in a different part of his back in "1990" (*id.*), [while the ALJ says "1990" (R. 221 and R. 234), referring to when he was injured on his job, there are no medical records of this time frame. There is evidence in the record the ALJ meant to refer to 1999 when Plaintiff had an EMG performed by Dr. Arbot (R. 98) likely related to his hurting his back in October 1999 on an assembly line machine (R. 80).]

Plaintiff expressed confusion about when he last worked, because he was on and off work due to his back injury (R. 220-21). His Disability Report indicated he became unable to work May 15, 2002, when his employer "did not have a job [text blackened by Xerox ink, but it appears to be "any more"] with my back conditions." (R. 48). ALJ Revels at the hearing also asked whether it was his employer not having a job that met the medical restrictions that required him to take medical leave (R. 229-30). He concluded that he was off work for two years, but worked for thirty days in January 2004 (R. 220-223, 225). He returned to Ford Motor Company at that time and informed the foreman of his restrictions, and was assigned to assembly work on air ducts (R. 226-27). His restrictions were "no lifting over five pounds, no excessive twisting, turning, bending or sitting" (R. 227). He re-injured himself and that led to his second back surgery (R. 229). Plaintiff stated that this 2004 surgery helped in that "[m]ost of the real, real uncontrollable pain is gone but I have nerve damage and numbness and no feeling in my leg. I've got what they call drop foot now . . . " (*Id.*)

Plaintiff testified that he started using a cane in 2002, and that his doctor encouraged him

to use it if he found that it helped (R. 237). It helped him support himself and helped to remind him "not to do stuff" (R. 238). Plaintiff uses the cane as an extension of his foot, and he stated, "I use it all the time because there is no way I could walk without it." (*Id.*) He also cannot walk on uneven surfaces (R. 239). Plaintiff stated that if he uses his leg too much, or if he drives, it swells up too much and he has to lay down and take care of it (R. 239).

Plaintiff can sit for around forty-five minutes to an hour before he experiences swelling in his leg (R. 241-242). Plaintiff feels more pain on colder days, so on warmer days he is able to sit for longer periods of time (R. 242). He can walk one half of a block or more if he takes pain medication; however, this results in swelling (R. 243).

Plaintiff stated that he experiences side effects from his Vicodin medication such as depression and becoming more aggressive (R. 243-44). When he suffers depression, he is not able to do the things that he used to, such going four-wheeling and camping with his son and riding his Harley (R. 245). He began mixing alcohol with pain medication and "got in trouble" (*Id.*) He stated, "I was suppose (sic) to go to rehab on that but I talked to my doctor and with my military experience they though I could do it myself, and I did" (R. 245-46).

After Plaintiff initially stopped working in May of 2002, Plaintiff agreed that a November 11, 2002, report by his physician, Dr. Sciotti, indicated that he was ready at that time to return to work with permanent restrictions (R. 232). His injury on the job in "1990" (sic, 1999) occurred when he was caught in assembly line machine while trying to pull out some tape stuck in it when someone turned the machine back on to keep the assembly line running (R. 234-35). While seriously injured, he worked through the pain, stating, ". . . I covered up the pain with the Vicodin, and I didn't know that I was hurting myself because of the medication" (R

235). Plaintiff later noted that they related the second injury to the earlier one "so the Workmen's (sic) Comp they only had to pay me '99 wages and not 2004 wages" (R. 247-48).[1]

ALJ Revels at the hearing tried to explain to the Plaintiff the problems she was having with his disability claim. She notes that after his second injury, causing him to leave work in May 2002, "the problem I have here is that your doctor did release you to return to work with restrictions in less than a year . . . ." (R. 235). Later, when Plaintiff noted that Ford had no jobs in 2002 that met his restrictions, Judge Revels explained that the question facing her was on "November the 26th, '02 . . . whether or not there was some other job that you could have done, not with Ford Motor Company but anywhere – " (R. 248-49). She noted later the second issue in his case was "then I have to make a determination as to from 2004 moving forward whether or not you are unable to work and it's not just doing your regular job but any other jobs in the national economy" (R 250).

### 3. *Medical Evidence*

Neither the Plaintiff's counsel nor the Secretary take any significant issue with the medical evidence summary provided by ALJ Revels, and neither give their own account of the medical record. Rather Plaintiff mainly disputes: (i) the conclusions ALJ Revels draws from that medical evidence on the Plaintiff's residual functional capacity; (ii) the sufficiency of the ALJ's credibility analysis; (iii) her reliance on only part of the vocational expert's testimony; and (iv) whether the number of jobs identified by the VE were "a significant number of jobs" so as to constitute "substantial gainful work" under 42 U.S.C. § 423(d)(2)(A). Accordingly, the

---

[1] Plaintiff's application indicates that his Workers' Compensation ended December 31, 2002 (R. 31), which would be shortly after the November 2002 determination that he could return to work with restrictions.

ALJ's summary, with record page reference added in brackets and with certain elaborations noted in the analysis portion, will be a suitable background on the medical evidence for purposed of this § 405(g) review.

> ALJ Revels summarized the medical evidence in the record as follows:
>
> An orthopedic consultative examination was conducted by Matthew J. Sciotti, M.D., February 26, 2002, at the request of the claimant's treating physician, for low back pain with paresthesias and numbness radiating in the L5-S1 distribution to the foot. Claimant alleged that sitting, standing, and walking increased his symptoms. The claimant's past medical history showed that in 1984, the claimant had back surgery at L4-5 on the right. An MRI in December 1999 revealed degenerative changes along with postoperative findings on the right at L4-5 but did not show any recurrent disc herniations. EMG testing in 1999 revealed ongoing evidence of deinnervation on the right at L5. Claimant was off work for 1 week in December 2001 and then returned to work. Based on physical examination and medical history, Dr. Sciotti diagnosed the claimant with right L5 radiculopathy; degenerative changes on the right at L4-5 with associated post operative changes; low back and right lower extremity pain, paresthesias, and numbness; and recommended physical therapy to include a lumbar stabilization program (Exhibit 1F, pp. 1-2) [R. 86-87].
>
> In a follow-up examination on May 15, 2002, the claimant stated that he slipped and twisted his back while walking off his truck bed and complained of low back pain with paresthesias and numbness radiating in the L5-S1 distribution to the foot. Physical therapy notes indicated that claimant's lower extremity symptoms had improved, however, he still had right buttock and low back pain. X-rays showed degenerative changes at L 5 with facet arthropathy and mildly decreased disc space. Dr. Sciotti ordered an MRI and restricted the claimant to no lifting over 5 pounds with no pulling, pushing, bending, and twisting (Exhibit 1F, pp. 7-8) [R. 92-93]. MRI results from May 22, 2002, revealed neural foraminal narrowing bilaterally at L4-S1 with mild thecal sac impression at L5, a small disc herniation at L4-5, and slight compression at right L5 nerve root.[2] The claimant stated that he was placed

---

[2]Plaintiff's counsel, in his brief at page 8, notes, "bilateral nerve root compression" as well as "[o]steophytic disc complex with mild anterior sac impression was also noted." Counsel also criticized ALJ Revels for adding modifiers, such as "*slight* compression and *mild* thecal sac impression. (TR 16) A review of Dr. Sciotti's notes reveal that he opined that Mr. Eagle suffers from 'Lumbar L4-5 disc herniation with bilateral nerve root compression of L5 in the lateral recesses.'"

Further, Plaintiff's counsel also asserts, on page 9 of his brief, that "On November 3, 2003, Dr. Sciotti notes that an MRI of the lumbar spine evidenced ossific spur slightly to the left

on medical leave by his employer (Exhibit 1F, p. 12) [R. 97]. In a follow-up examination on July 18, 2002, Dr. Sciotti changed the claimant's work restrictions to no lifting over 5 pounds, allow sit/stand, and no pushing, pulling, bending, and twisting (Exhibit 1F, p. 14) [R. 99]. As of November 26, 2002 the claimant's symptoms had not changed although the claimant presented that day using a non-prescribed cane for ambulation (Exhibit 1F. p. 22) [R. 107].

An MRI scan of the claimant's lumbar spine taken on January 9, 2004 revealed a stable circumferential disc bulging with a focal central disc herniation at L4-5 and a round area measuring approximately 8 mm. with abnormal signal noted paracentrally to the right, posterior to the L5 vertebral segment extending inferiorly into the lateral recess and appears to abut the right L5-S1 nerve root suspicious for a large extruded fragment (Exhibit 8F, p. 3) [R. 147].

On February 24, 2004 the claimant underwent a partial laminectomy of L4 with trimming of L4-5 disk and a partial laminectomy of L5 with trimming of L5-S1 disk (Exhibit 10F, pp. 12-13) [R. 181-82]. Physical therapy notes indicate that the claimant was meeting expectations for progress (Exhibit 10F, pp 15-16) [R. 184-85]. Dr. Asad A Mazhari, M.D., conducted a follow-up examination of the claimant on April 8, 2004 in which he placed the claimant in a no work status for two months (Exhibit 10F, pp. 20-22) [R. 189-91].

Progress notes from August 1998 through May 2005 indicate that the claimant was being treated for chronic migraine headaches (Exhibit 9F). The claimant underwent psychological counseling at St. John Eastwood Clinics beginning July 22, 2002. An initial intake assessment diagnosed the claimant with opiod dependence. Treatment notes from October 22, 2002, indicated that the claimant stopped using mood-altering substances. The claimant was discharged on November 25, 2002 with a final diagnosis of adjustment disorder with depressed mood and a GAF of 60 (Exhibit 2F). A psychological consultative evaluation conducted on April 12, 2003, at the request of the state agency, diagnosed the claimant with adjustment disorder with mixed anxiety and depressed mood and a GAF of 65 (Exhibit 5F, p. 4).
. . .
On June 2, 2004, Dr. Mazhari wrote that claimant's lumbar pain was level "6" without medication and level "2" with medication. [R. 198]. The claimant's pain

---

of midline L5-S1as well as diffuse bulging and central disc herniation at L4-5." Although, Plaintiff's counsel fails to cite to the record for these findings, the undersigned located same under Dr. Mazhari's notes from October 3, 2003 (R. 193). Obviously, this impairment was operated on with some success. Plaintiff's own testimony was that "[m]ost of the real, real uncontrollable pain is gone" (R. 229). Additionally, Dr. Mazhari noted "although his pain is gone, he still continues to have foot drop" (R. 200). Nonetheless, there is no evidence to indicate that a "foot drop" would cause swelling.

> only limited activity to a mild degree with symptoms reduced by physical therapy (Exhibit 10F, p. 25). A physical residual functional capacity assessment completed by a state medical reviewer on March 25, 2003 concluded that the claimant could perform a limited range of work at the sedentary exertional level with additional postural limitations (Exhibit 4F). These conclusions of the state agency doctor are consistent with the findings of the undersigned after a thorough analysis of the totality of the evidence.

(R. 15-16, 17).

### 4.   *Vocational Expert Testimony*

VE James Fuller testified that Plaintiff's past relevant work as an automobile assembler was an unskilled job, of medium physical demand. The ALJ asked the VE to consider a hypothetical person of Plaintiff's age, education, and work experience, who could perform "simple routine, repetitive type work tasks because of moderate limitations in the ability to maintain concentration for extended periods of time due to pain. Also moderate limitations in the ability to carry out detailed instructions because of depression, which also created some difficulties with memory for awhile." (R. 257). The individual would also have the following work restrictions: no working at hazardous heights or around dangerous machinery; no bending, climbing, stooping, kneeling, crouching, crawling, twisting, pushing, or pulling; no operating in cold temperature extremes; no work with vibrating tools; no work on uneven surfaces; and he must be able to use a cane (R. 257-58). The individual can sit for no more than forty-five minutes to an hour, stand for no more than ten or fifteen minutes, can walk no further than one half of a block, and can lift no more than five pounds (R. 258). VE Fuller responded that such an individual could work as an assembler (with approximately 2,000 positions in Southeast Michigan), packer (2,000 positions), and sorter/visual inspector (3,000) positions (R. 258, 260). These positions are classified as sedentary, unskilled jobs (R. 258-260).

Plaintiff's testified that he needs to elevate his legs for a few hours everyday to reduce

swelling (R. 261-62).  VE Fuller noted that this non-exertional limitation precludes work in any of the jobs (R. 262-63).

### 5. *The ALJ's Decision*

ALJ Revels found that Plaintiff meets the non-disability requirements for DIB insured status through December 31, 2009 (R. 13, 19).  She also found that Plaintiff did not engage in any substantial gainful activity from the alleged onset date through January 2004 (R. 15).  Although Plaintiff's back disorders, migraines, and depression were considered severe impairments under 20 C.F.R. § 404.1520(c), ALJ Revels found that these impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 (R. 15, 19).  None of these findings are challenged by Plaintiff.

ALJ Revels also found that Plaintiff's allegations regarding his limitations were not fully credible (R. 19).  ALJ determined that Plaintiff retains the residual functional capacity ("RFC") to perform a limited but significant range of work at the sedentary exertional level (R. 19-20), so long as the jobs are limited as follows:

> [L]ifting up to 5 pounds maximally; sitting for up to 1 hour at a time; standing for up to 15 minutes at a time; and walking up to half a block, with the use of a cane.  The work must not required the use of vibrating tools r operating around hazardous heights or dangerous machinery.  The work must also be restricted to even surfaces with no cold temperature extremes.  The work cannot require climbing, bending, stooping, crouching, kneeling, crawling, twisting, pulling, pushing, or driving. [Plaintiff] is also limited to simple, repetitive or unskilled work because of moderate limitations in his ability to maintain concentration for extended periods due to pain and moderate limitations in his ability to maintain concentration for extended periods due to pain and moderate limitations in his ability to carry out detailed instructions due to depression and memory problems.

(R. 19-20).

While acknowledging that Plaintiff is unable to perform any of his past relevant work,

she noted that he is a younger individual, and has more than a high school education, and at his age transferability of skills is not an issue (R. 20). Using Medical-Vocational Rule 201.28 and 202.21 as a framework for decision-making these rules cannot direct a finding of not disabled because ALJ Revels concluded that although Plaintiff's exertional limitation do not allow him to perform the full range of sedentary work. Yet, based on VE testimony she found that there are a significant number of jobs in the national economy that he could perform, such as: work in assembly (2,000 jobs), packaging (2,000 jobs), and sorting/visual inspection (3,000 jobs) and accordingly Plaintiff is not disabled at any time through the date of her August 25, 2005, decision.

## II. ANALYSIS

### A. Standard Of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of

proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[3] A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

    B.   **Factual Analysis**

As noted above, Plaintiff mainly disputes: (i) the conclusions ALJ Revels draws from that medical evidence on the Plaintiff's residual functional capacity; (ii) the sufficiency of the ALJ's credibility analysis; (iii) her reliance on only part of the vocational expert's testimony; and (iv) whether the number of jobs identified by the VE were "a significant number of jobs" so as to constitute "substantial gainful work" under 42 U.S.C. § 423(d)(2)(A) The Sixth Circuit held that 1,350 to 1,800 jobs in a nine-county area satisfied this "significant number" requirement of § 423(d)(2)(A). *Hall v. Bowen*, 837 F.2d 272 (6th Cir. 1988).

While Plaintiff has significant impairments related to his back, and certain psychological and other impairments, the issue, as articulated by ALJ Revels at the hearing, is whether Plaintiff

---

[3] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

has been disabled from all substantial gainful employment under 42 U.S.C. § 423(d)(2)(A).[4]

On the present record, ALJ determined Plaintiff has a RFC that includes lifting up to 5 pounds maximally; sitting for up to 1 hour at a time; standing for up to 15 minutes at a time; and walking up to half a block, with the use of a cane. The state evaluator determined that Plaintiff could frequently lift up to 10 pounds, stand or walk 2 of 8 hours, sit 6 of 8 hours (R. 118). At his hearing Plaintiff admitted he could sit for around forty-five minutes to an hour and even longer in a warmer environment (R. 241-242). He earlier admitted being able to lift and carry five to ten pounds, and on a good days stand for 30-45 minutes and sit for two to four hours. (R. 82). He also testified that he can walk one half of a block or more if he takes pain medication (R. 243).

Plaintiff treating physician, Dr. Sciotti, noted that Plaintiff was off work for one week in December 2001 after he slipped and twisted his back while walking off his truck bed (R. 92). While Plaintiff claimed in his hearing request to see his treating physician, Dr. Sciotti, almost two times a week for his back pain (R. 83), Dr. Sciotti's records show his visits were three and most often four weeks apart in 2002, and by November Dr. Sciotti extended that to every 2-3 months (R. 107). In July 2002, Dr. Sciotti repeated claimant's work restrictions as no lifting over 5 pounds, allow sit/stand, and no pushing, pulling, bending, and twisting (R. 99). These

---

[4] 42 U.S.C. § 423(d)(2)(A):
An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy….[W]ork which exists in the national means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

restrictions were never increased by Dr. Sciotti except possibly for the addition of a sit/stand option in June 2002 (*compare* R. 93 *and* R. 95)   Throughout most of his multiple reports in 2002, Dr. Sciotti repeated that while there was evidence of a past work related injury to Plaintiff's spine in 1999, he did not believe his 2002 impairment was from an "acute" injury, but rather it was the result of a degenerative process (*see e.g.* R. 86, 89, 91, 93, 95, 97 , 99, 101, 103, 105, 107).

     While not providing a complete sit/stand option at will as Dr. Sciotti may have intended, the ALJ's RFC does limit sitting to an hour and standing to 15 minutes, which a reasonable fact finder could consider to be within the sitting and walking limits that Plaintiffs admitted.   In addition to adopting Dr. Sciotti's limits on bending, twisting, pulling, and pushing and a 5 pound lifting maximum, ALJ Revels added further restrictions on climbing, stooping, crouching, kneeling, crawling, and driving to the RFC used in her hypothetical question. (R. 19-20).   There is substantial evidence in the record to uphold the physical limitations in this hypothetical question.

     While ALJ Revels could have been more explicit in her credibility determination as urged by SSR 96-7p, most of the physical limitations in the RFC are generally in accordance with Plaintiff's statements or those of his treating physician. She does note that Plaintiff's treating physician indicated that his limitations were consistent with sedentary work (R. 17).   She noted Plaintiff's daily activities including 4 hours of errands and shopping, etc.   That sometimes caused him to overdo it and need to lie down.   Yet, she added that "[t]here is no evidence of record or testimony that if the claimant worked within the restrictions given and in the type of jobs outlined by the vocational expert that he would need to lie down or elevate his

legs due to swelling." (*Id.*)  Regarding the statement that he must elevate his legs for a few hours everyday to reduce swelling, there is noting in his pre-hearing submissions on his disability claim mentioning this swelling problem.  Nor is there anything Plaintiff's counsel points to in the medical record related to swelling of legs or the need to elevate them.  This leg claim appears for the first time at his hearing when he states that walking or sitting too long causes numbness or swelling in his legs.  After acknowledging that his 2004 surgery helped alleviate the "real uncontrollable pain,"   he then claimed nerve damage,  numbness in his legs and "drop foot" were his impairments (R. 229).  On July 7, 2004, Dr. Mazhari did note "although his pain is gone, he still continues to have foot drop" (R. 200).

> 42 U.S.C. § 423(d)(5) states that:
>
> An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; **there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged** and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability.

(Emphasis supplied).

Applying 42 U.S.C. § 423(d)(5),  20 C.F.R. § 404.1529(a) makes it clear that "statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain symptoms alleged." *Duncan v. Secretary of Health & Human Services,* 801 F.2d 847, 853 (6th Cir.1986), notes and upholds the legitimacy

of the two step process of evaluating subjective claims established by the statute and regulation:

> **First,** we examine **whether there is objective medical evidence of an underlying medical condition.** If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

(Emphasis supplied).

Here there is objective medical evidence of an underlying back problem that could cause back pain and pain radiating into the legs. Yet, while Plaintiff claims it is because of his blood pressure and medications,[5] Plaintiff has not presented medically acceptable evidence of a underlying medical condition that would likely cause severe leg swelling. In the absence of such a showing at the first step of *Duncan* there is little need for an ALJ to make extensive credibility findings under SSR 96-7p concerning this newly described limitation of the Plaintiffs. ALJ Revels was justified in not including the need to lie down or to elevate the legs for extensive periods in her RFC and her hypothetical question.

As a result, the complaint of Plaintiff's counsel that the ALJ ignored the VE's response that a hypothetical worker could do no jobs if one incorporated the additional limitations of a need to lie down and to elevate the legs, which were added by Plaintiff's counsel, is without merit. On this record, the ALJ was within her legal discretion to rely on a hypothetical question that did not include these additional, and medically unsupported, limitations.

Concerning Plaintiff's non-physical limitations, ALJ Revels added to her hypothetical question to VE Fuller that the worker could only perform "simple, routine, repetitive type tasks

---

[5]On November 11, 2004, Dr. Mazhari noted Plaintiff "wishes to continue the conservative management program" and there are "[n]o side effects regarding blood pressure, pulse, respiration, or neurological status" (R. 210).

because of moderate limitations in the ability to maintain concentration for extended periods due to pain.  Also moderate limitations in the ability to carry out detailed instructions because of depression, which also created some difficulties with memory for awhile" (R. 257).  Thus, Plaintiff's non-physical limitations were adequately accommodated in the hypothetical question.

Accordingly, it is found that there is substantial evidence in the record to uphold ALJ Revel's hypothetical question.  She is thus entitled to rely on VE Fuller's response that in the regional economy there are sedentary, unskilled jobs including approximately 2,000 assembler positions, 2,000 packer positions and 3,000 sorter/visual inspector positions (R. 258-260).  It is these 7,000 jobs ALJ Revels relied upon in finding Plaintiff not disabled, and as a matter of law this 7,000 number constitutes  "a significant number of jobs" under  20 C.F.R. § 404.1566(b) to demonstrate the availability of "substantial gainful work" under 42 U.S.C. § 423(d)(2)(A).   The Sixth Circuit held that 1,350  to 1,800 jobs in a nine-county area satisfied this "significant number" requirement of § 423(d)(2)(A).  *Hall v. Bowen*, 837 F.2d at 275.  Thus, there is substantial evidence in the record to uphold the Commissioner's denial of benefits.

**III.    RECOMMENDATION**

For the reasons stated above, It is RECOMMENDED that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's motion for summary judgment be DENIED .

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS,* 932 F.2d 505 (6th

Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: December 28, 2006                               s/ Steven D. Pepe
Flint, Michigan                                        United States Magistrate Judge


**CERTIFICATE OF SERVICE**

I hereby certify that on **December 28, 2006**, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Janet L. Parker, AUSA, Justen E. Grech, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s): Social Security Administration - Office of the Regional Counsel, 200 W. Adams, 30th Floor, Chicago, Il 60606.

                                                       s/Durene Worth
                                                       Deputy Clerk